**UNITED STATES of America,**
**Plaintiff,**

v.

**Cynthia I. PARK–SWALLOW,**
**Defendant.**

**No. 00–40019–01–SAC.**

United States District Court,
D. Kansas.

June 15, 2000.

James A. Brown, Office of United States Attorney, Topeka, KS, for plaintiff.

Mark J. Sachse, Kansas City, KS, for defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

The case comes before the court following additional briefs and a supplemental hearing on the defendant's pretrial motion to suppress all evidence seized in the search of her vehicle on November 3, 1998. (Dk.11). On April 18, 2000, the court filed its order denying the defendant's motion to suppress the evidence seized from her residence. In that same order, the court took under advisement her motion to suppress the evidence seized from her vehicle and directed the parties to file supplemental briefs and to present any additional evidence. The court conducted the supplemental hearing on May 31, 2000. Having reviewed the memoranda and evidence, the court is ready to rule.

## FACTS

By affidavit attached to her original memorandum, the defendant avers that on November 3, 1998, Officer Haulmark approached her vehicle. She denies that the officer ever asked for consent to search her vehicle. She remembers being asked and specifically refusing to sign a form consenting to the search of her vehicle.

At the first suppression hearing, Officer Steven Haulmark with Kansas City, Kansas, Police Department testified that on the evening of November 3, 1998, he observed a car illegally parked with its headlights on outside a bar at 812 S. 12th Street. As he pulled up behind the car and stopped, Officer Haulmark was met by the defendant who came out of the bar and asked if there was something wrong with her car. The defendant was carrying a bag of groceries and told the officer her identity. With his flashlight, Officer Haulmark observed an open can of beer inside the defendant's car. He ran a computer check and learned that the defendant had been recently arrested for narcotics. Officer Haulmark also knew that the immediate area was known for narcotics activity. Based on all this information,[1] Officer Haulmark asked the defendant if she had any drugs or guns inside her car. The defendant said there were none.

Using a conversational tone of voice, Officer Haulmark next asked the defendant for permission to search her car. Haulmark testified that the defendant appeared responsive, coherent, and not intoxicated. His weapon was not drawn, and he did not touch her or use any force or deception. The defendant told the officer to "go ahead" and search the car. Near the driver's seat, Officer Haulmark found a loaded handgun. He then lifted the hood and saw a black box which he opened and found to contain drugs. The defendant was present at the search and voiced no

[1]. On cross examination, Officer Haulmark testified that when he asked for consent to search that he had "no evidence at all that this individual [was] ... involved in any other illegal activity at that time." He even testified that he "didn't really expect to find anything in her vehicle."

objection at anytime during it. Approximately twenty minutes after his search, Officer Haulmark asked the defendant to sign a written consent form for a canine search of the car. The defendant refused to sign the form.

At the supplemental hearing, Officer Haulmark testified in more detail about this incident. He was patrolling his assigned area around 9:00 p.m. when he first observed a car illegally parked with its headlights on. After stopping his patrol car behind it, he approached it on foot to determine if the parked car was occupied. At that point, the defendant walked out of the bar and asked the officer if there was something wrong. In response to the officer's question, the defendant claimed ownership of the car. Officer Haulmark then informed the defendant that the car was "improperly parked" with its lights on and that he wanted to make sure there were "no problems." As they talked, Officer Haulmark looked inside the car and observed a beer can on the center console. Officer Haulmark then asked for the defendant's identification or license and while in the defendant's presence he radioed dispatch for a computer check on it. He also asked for her vehicle registration which she retrieved from the glove box in her car. Officer Haulmark testified, however, that he was only investigating a parking violation at this point and that it was routine for him to obtain a driver's license before issuing a parking ticket.

When asked what he told the defendant while the license check was being run, Officer Haulmark testified that they "were just having a conversation" and that he considered the defendant as being free to go. The defendant never asked the officer if she could leave nor expressed a similar intent. Officer Haulmark denies ever telling the defendant that she needed to stay. From dispatch, Officer Haulmark learned of the defendant's prior arrest for narcotics. He then asked the defendant if there were any illegal items in her car. When the defendant answered, "no," the officer asked for permission to search her car. The defendant said, "go ahead."

## GOVERNING LAW

A car may be validly searched without a warrant or probable cause if a person in control of the vehicle gives voluntary consent to the search. *See United States v. Santurio,* 29 F.3d 550, 552 (10th Cir.1994). "Valid consent is that which is freely and voluntarily given." *United States v. Patten,* 183 F.3d 1190, 1194 (10th Cir.1999) (citation omitted). Voluntariness is a question of fact to be determined from the totality of all the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). A court makes this determination without presuming the consent was voluntary or involuntary. *United States v. Hernandez,* 93 F.3d 1493, 1500 (10th Cir.1996). The burden is with the government to prove the consent was voluntary. *United States v. Patten,* 183 F.3d at 1194. The government first "must present 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.'" *United States v. Pena,* 143 F.3d 1363, 1367 (10th Cir.) (quoting *United States v. Angulo–Fernandez,* 53 F.3d 1177, 1180 (10th Cir.1995)), *cert. denied,* 525 U.S. 903, 119 S.Ct. 236, 142 L.Ed.2d 194 (1998). The government also must prove that the officers used no duress or coercion in obtaining the consent. *Id.; United States v. Hernandez,* 93 F.3d at 1500 (citations omitted).

There are various factors relevant to this determination. An officer's failure to advise that a person may refuse to consent is relevant, but it is only one factor and is not dispositive. *United States v. Pena,* 143 F.3d at 1367; *see also United States v. Little,* 60 F.3d 708, 713 (10th Cir.1995). Other relevant factors include the number of officers present, "'physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and physical and mental condition and capacity of the defendant within the totality of the circumstances.'" *United States v. Pena,* 143 F.3d at 1367 (quoting *United States v.*

*McCurdy,* 40 F.3d 1111, 1119 (10th Cir. 1994) (internal quotation omitted)). Finally, the court must determine whether the consent to search was the result of any detention or seizure in violation of the Fourth Amendment.

■ "Not all encounters between the police and citizens implicate the Fourth Amendment's prohibition on unreasonable searches and seizures." *United States v. Rodriguez,* 69 F.3d 136, 141 (7th Cir.1995). The Tenth Circuit recognizes three categories of police encounters: (1) a consensual encounter which is not a Fourth Amendment seizure; (2) an investigative detention which is a Fourth Amendment seizure of limited scope and duration and must be supported by reasonable suspicion of criminal activity; and (3) an arrest which is the most intrusive Fourth Amendment seizure and must be supported by probable cause to be reasonable. *United States v. Hill,* 199 F.3d 1143, 1147 (10th Cir.1999), *petition for cert. filed,* —— U.S.L.W. ——, (U.S. Apr. 19, 2000) (No. 99–9245); *United States v. Shareef,* 100 F.3d 1491, 1500 (10th Cir.1996).

■ "A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer." *United States v. Hernandez,* 93 F.3d 1493, 1498 (10th Cir.1996). Supreme Court precedent is clear "that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual.'" *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In deciding if the police encounter was consensual, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *United States v. Hill,* 199 F.3d at 1147 (quoting *Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). Put another way, "[a] person is seized only when that person has an objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her way." *United States v. Hernandez,* 93 F.3d at 1498 (citation omitted). The question whether an encounter was consensual is a matter for the refined judgment of the district court. *United States v. Patten,* 183 F.3d at 1194.

■ When the detention was unlawful, "evidence obtained as a result of that illegal detention must be excluded to the extent it was the fruit of the poisonous tree." *United States v. Miller,* 84 F.3d 1244, 1250 (10th Cir.), *cert. denied,* 519 U.S. 985, 117 S.Ct. 443, 136 L.Ed.2d 339 (1996). In short, the government must not only "show that consent is voluntary in fact, but it must also demonstrate a break in the causal connection between the illegality and the consent, so that the court will be satisfied that the consent was 'sufficiently an act of free will to purge the primary taint.'" *United States v. Melendez–Garcia,* 28 F.3d 1046, 1054 (10th Cir. 1994) (quoting *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)); *see United States v. Davis,* 197 F.3d 1048, 1052 (10th Cir.1999). In determining whether the illegal detention taints the defendant's consent to search, the court looks to the following rules:

"A search preceded by a Fourth Amendment violation remains valid if the consent to search was voluntary in fact under the totality of circumstances." *United States v. Fernandez,* 18 F.3d 874, 881 (10th Cir.1994); (citation omitted). "The government bears the burden of proving the voluntariness of consent, and that burden is heavier when

consent is given after an illegal [detention]." *Fernandez,* 18 F.3d at 881 (citations omitted); (citation omitted). The government must demonstrate that Mr. McSwain's consent to search is "sufficiently an act of free will to purge the primary taint of the illegal [detention]." (footnote omitted); *United States v. Maez,* 872 F.2d 1444, 1453 (10th Cir. 1989); (citations omitted). No single fact is dispositive under the totality of the circumstances test, (citation omitted), but the three factors articulated in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), are especially relevant: "the temporal proximity of the ·illegal detention and the consent, any intervening circumstances, and, particularly, the purpose and flagrancy of the officer's unlawful conduct." [*United States v.*] *Walker,* 933 F.2d [812] at 818 [ (10th Cir.1991)] (citations omitted).

*United States v. McSwain,* 29 F.3d 558, 562 (10th Cir.1994); *see United States v. Gregory,* 79 F.3d 973, 979 (10th Cir.1996).

## ANALYSIS

Unlike a routine traffic stop case, Officer Haulmark did not pull over the defendant's car. Rather, he was approached by the defendant as he began investigating the illegally parked car. The defendant was the first to speak asking if there was something wrong. All of the circumstances lead the court to the conclusion that the encounter between Officer Haulmark and the defendant was consensual at the outset. The question presented is whether the encounter remained consensual prior to the officer asking about illegal items in the defendant's car and seeking the defendant's permission to search her car.

 " '[A]ccusatory, persistent, and intrusive' questioning may turn an otherwise voluntary encounter into a coercive one if it conveys the message that compliance is required." *United States v. Hernandez,* 93 F.3d at 1499 (citations omitted). In response to the defendant's opening query about anything being "wrong," Officer Haulmark asked whether the car belonged to the defendant, who said it did.

At this point, the officer's questioning and conduct became more than routine conversation and turned accusatory and pointed in several respects, as he believed that he was investigating a parking violation. He told the defendant that the car was illegally parked and that he "wanted to make sure there were no problems." He walked around the car and peered through the windows. There were no other persons inside the car. Observing a open beer can on the center console, Officer Haulmark asked the defendant for identification. He took her license and radioed dispatch for a computer check to be run. He also requested the defendant to retrieve the vehicle registration from her car.

At this point in time based on Officer Haulmark's questions, requests and actions, a reasonable person in the defendant's position would not believe that she was free to ignore the officer's questions and requests and simply get in her car and go about her business. Rather, such a person would have understood that the officer considered her to have committed a parking violation, that the officer wanted her driver's license and vehicle registration as part of his investigation of the same, and that she was not free to leave until a ticket was issued. *See, e.g., United States v. Sargent,* 153 F.3d 729, 1998 WL 454116, at *1 (10th Cir. July 28, 1998) (A consensual encounter turned into an investigative detention when the officer learned the driver lacked a license, decided to check on the driver's license status, and asked the driver to accompany him to the officer's car for the check. The officer never advised the driver that he could decline the request for information to conduct the license check. "[N]o factors suggest that a reasonable person would have felt free to leave after the officer learned of the lack of a license and decided to check on driver's license status."), *cert. denied,* 525 U.S. 1032, 119 S.Ct. 572, 142 L.Ed.2d 477 (1998). Nor could have a reasonable person inferred from Officer Haulmark's words or actions that she could refuse his request to produce a driver's license, that

the officer did not expect her to remain present, or that he was not investigating a parking violation for the apparent purpose of issuing some kind of ticket or warning. Indeed, Officer Haulmark gave the defendant no other explanation for the need to see her license and vehicle registration and did not tell her that she was free to leave at any point during his investigation. *See United States v. Little,* 60 F.3d at 713 (10th Cir.1995) ("The giving of such advisements is relevant to the inquiry, and it logically follows that the omission of such advisements is also relevant, while not dispositive, in making the finding" whether a reasonable person would have understood she was free to decline the officer's request and end the encounter.)

Moreover, the government offered no evidence that Officer Haulmark simply examined the defendant's license and registration without taking and retaining possession of them. Indeed, there is no evidence that Officer Haulmark ever returned these documents prior to asking about the presence of illegal items in the defendant's car and seeking her permission to search it. The defendant was "seized" under Fourth Amendment concepts when she turned over her license and registration and the officer retained them. *See United States v. Lujan,* 188 F.3d 520, 1999 WL 565524, at *4 (10th Cir. Aug.3, 1999) (Table) (citing *Florida v. Royer,* 460 U.S. 491, 501–02, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) (as holding that "when a suspect's ticket and driver's license were retained by identified narcotics agents, the suspect was 'effectively seized for the purposes of the Fourth Amendment' "), and *United States v. Lambert,* 46 F.3d 1064, 1068 (10th Cir.1995) (as holding that " 'what began as a consensual encounter quickly became an investigative detention once the agents received [the suspect's] driver's license and did not return it to him")); *United States v. Ashcraft,* 117 F.3d 1429, 1997 WL 400048, at *3 (10th Cir. July 16, 1997) ("[A] consensual encounter ordinarily does become an investigative detention once the officer re-

tains such documentation because the individual will not reasonably feel free to terminate the encounter." (citations omitted)). In such circumstances, Officer Haulmark could detain the defendant only if he had reasonable suspicion that she was engaged in criminal activity.

Officer Haulmark did have sufficient grounds to detain the defendant based on the parking violation and the open beer container visible in the defendant's car. An "investigative detention usually must 'last no longer than is necessary to effectuate the purpose of the stop,' and '[t]he scope of the detention must be carefully tailored to its underlying justification.' " *United States v. Hunnicutt,* 135 F.3d 1345, 1349 (10th Cir.1998) (quoting *Florida v. Royer,* 460 U.S. at 500, 103 S.Ct. 1319). "If the driver produces a valid license and proof of right to operate the vehicle, the officer must permit the driver to continue on his way without delay for further questioning." *United States v. Gregory,* 79 F.3d at 979 (citation omitted). Specifically, a person may not be detained for further questioning that is unrelated or beyond the purpose of the initial investigation detention, unless the officer has an objectively reasonable and articulable suspicion that the driver is engaged in other illegal activity or unless the initial investigative detention has become a consensual encounter. *Hunnicutt,* 135 F.3d at 1349. The court has already found that the initial consensual encounter had escalated into an investigative detention prior to the questioning about illegal items. There is no evidence that Officer Haulmark took any steps to resume a consensual encounter. In addition, there is no evidence that Officer Haulmark had reasonable suspicion of other illegal activity when he extended the investigative detention by these additional questions. Officer Haulmark testified that when he made these queries he did not have any evidence of the defendant being involved in other illegal activity and did not believe he would find anything in the defendant's car. Thus, the defendant was unlawfully detained when she consented to the search of her car.

■ The government concedes that the first two factors from *Brown* weigh against a finding that the defendant's consent was voluntary: "The consent here basically followed on the heels of the unlawful detention and there were no intervening circumstances." (Government's Supplemental Response, Dk. 25, p. 14). Actually, the defendant gave her consent while being unlawfully detained, thus, the factors of temporal proximity and intervening circumstances strongly militate in favor of suppression. The Tenth Circuit has "repeatedly held that consent is not voluntary when in such close temporal proximity to an illegal [detention]...." *United States v. Gregory*, 79 F.3d at 980 (citations omitted). The absence of intervening circumstances means a "lack of attenuation sufficient to make defendant's subsequent consent voluntary." *Id.*

The government contends the defendant's consent here "is saved ... because the 'purpose and flagrancy' of the officer's unlawful conduct was absolutely *de minimis*, and there was no 'exploitation' of the primary illegality." (Dk.25, p. 14). This argument does not persuade the court. It is true that "the 'purpose and flagrancy' prong of the *Brown* test can only be aimed at exploring whether the police have exploited their illegal search." *United States v. Melendez–Garcia*, 28 F.3d at 1055. The facts of this case, however, do not establish a situation in which the officer did not exploit an illegal detention. First, while more serious or egregious Fourth Amendment violations occur, this case involves police conduct, detaining a person with questions beyond the proper scope of the initial stop, that the *Brown* test was meant to discourage. *See United States v. Miller*, 146 F.3d 274, 280 (5th Cir.1998). Officer Haulmark's violation may not be so flagrant as to tilt the scales against attenuation, *United States v. Boone*, 62 F.3d 323, 325 (10th Cir.), *cert. denied*, 516 U.S. 1014, 116 S.Ct. 576, 133 L.Ed.2d 499 (1995), but neither is it so *de minimis* as to outweigh the other factors and tilt the scales towards attenuation. Second, as revealed by Officer Haulmark's own testimony, he detained the defendant " 'with a quality of purposefulness.' " *United States v. McSwain*, 29 F.3d at 563 (quoting *Brown*, 422 U.S. at 605, 95 S.Ct. 2254). Not believing he would find anything in the car but acting on a hunch drawn from the defendant's recent narcotics arrest, Officer Haulmark's only apparent purpose for detaining the defendant with these additional questions "was to embark upon an improper 'fishing expedition in the hope that something might turn up.' " *United States v. Gregory*, 79 F.3d at 980 (quoting United States v. McSwain, 29 F.3d at 563). In his testimony, Officer Haulmark essentially admitted that he was not inclined to ticket the defendant for the parking violation or for the open container violation. Rather, he exploited the situation by accusing the defendant of a parking violation and making requests consistent with the ticketing process in an apparent effort to gain information of other possible criminal activity. When he learned of the recent narcotics arrest, Officer Haulmark exploited the fact that the defendant had been seized and requested the defendant to reveal if the car contained any illegal items and to give him permission to search it.

Considering the totality of the circumstances with special attention to the *Brown* factors, the court concludes that the defendant's consent was not sufficiently an act of free will to purge the primary taint of the illegal detention. At the hearing, the government conceded there were no facts to sustain a colorable argument that the items seized from the defendant's car would have been inevitably discovered. Thus, the court grants the defendant's motion to suppress the evidence seized from her car.

IT IS THEREFORE ORDERED that the defendant's motion to suppress (Dk.11) is granted as to the evidence seized from her vehicle on November 3, 1998.